# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DR. DAVID M. GOLDENBERG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2020-0523-JTL |
| | ) | |
| IMMUNOMEDICS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: March 19, 2021
Date Decided: April 19, 2021

Richard P. Rollo, Susan M. Hannigan, John T. Miraglia, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Naveen Modi, PAUL HASTINGS LLP, Washington, D.C.; Eric W. Dittmann, Joshua M. Bennett, PAUL HASTINGS LLP, New York, New York; *Attorneys for Plaintiff.*

David J. Teklits, Kevin M. Coen, Alexandra M. Cumings, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Michael E. Swartz, SCHULTE ROTH & ZABEL LLP, New York, New York; *Attorneys for Defendant.*

**LASTER, V.C.**

Plaintiff Dr. David M. Goldenberg participated in a multi-party settlement that resolved prior litigation involving defendant Immunomedics, Inc. ("Immunomedics" or the "Company"). The court approved the settlement and entered a final order implementing its terms. Pertinent to this case, the final order obligated the Company to comply with the terms of Goldenberg's employment agreement.

Goldenberg maintains that the Company breached his employment agreement and violated the final order. He initially moved to enforce the final order in the action in which it was entered. The Company opposed that motion and argued that Goldenberg should file a new action because (i) the motion raised disputes that were distinct from the factual and legal issues addressed in the prior case, and (ii) the disputes were factually and legally complex, should be tested at the pleading stage, and any surviving claims would require discovery and an evidentiary hearing. The Company noted that if Goldenberg filed a new action, then the parties could litigate as contemplated by the Court of Chancery Rules, rather than asking the court to construct a bespoke procedure. The court denied Goldenberg's motion without prejudice and instructed Goldenberg to file a new lawsuit.

Goldenberg complied by filing this action. He styled his claim to enforce the final order as a count for civil contempt, and the Company moved to dismiss that count under Rule 12(b)(6) as failing to state a claim on which relief can be granted. Relying on decisions which observe that there is no cause of action for civil contempt, the Company argues that Goldenberg cannot pursue a claim to enforce the final order in this action. None of those decisions involved a party that tried to enforce an order in the action in which it was entered, only to be told to file a new action. In light of the procedural history of the dispute,

Goldenberg can maintain a claim to enforce the final order in this action. If Goldenberg can prove that the Company acted contumaciously, then the court will have the discretion to deploy civil contempt as one possible remedy.

Goldenberg also asserted a claim for breach of his employment agreement. The Company moved to dismiss that claim as well, contending that none of Goldenberg's contractual theories could support a claim on which relief can be granted. For the majority of his theories, Goldenberg has offered a reasonable reading of his employment agreement and has alleged facts that could provide a basis for recovery, so the Company's motion to dismiss is denied. In a minority of situations, Goldenberg has not offered a reasonable reading of the agreement, and the Company's motion is granted in part.

Finally, Goldenberg sought declaratory judgments regarding certain provisions in his employment agreement. The Company moved to dismiss those claims under Rule 12(b)(1) for lack of subject matter jurisdiction, contending that justiciable disputes do not exist. The Company is correct as to the two requests for relief identified in the complaint. Goldenberg argues that other disputes became manifest during briefing, but those issues either will be resolved on the merits of Goldenberg's breach of contract claims or need not be resolved at this time. The count seeking declaratory judgments is therefore dismissed.

## I.    FACTUAL BACKGROUND

The facts are drawn from the complaint, the documents it incorporated by refence, and relevant publicly filed documents that are subject to judicial notice. At this procedural stage, the complaint's well-pleaded factual allegations are accepted as true, and all reasonable inferences are drawn in favor of the plaintiff.

## A. Goldenberg's Relationship With The Company

Goldenberg is an experimental pathologist, cancer researcher, and inventor of cancer-fighting agents. Over the course of his career, Goldenberg has invented over 400 patented products and technologies.

In 1982, Goldenberg founded the Company to commercialize aspects of his research. The Company's business came to focus on a drug that Goldenberg developed—sacituzumab govitecan—known by its research abbreviation "IMMU-132." The FDA recently approved IMMU-132 to treat patients with metastatic triple-negative breast cancer.

Goldenberg served in various leadership roles at the Company from 1982 through 2017, including as Chief Executive Officer, Chief Scientific Officer, Chief Patent Officer, and Chairman of the Board. As part of the settlement at issue in this litigation, Goldenberg resigned from all of his positions as an officer or employee of the Company on November 2, 2017. Goldenberg remained a member of the Company's board of directors (the "Board") until April 2018.

When he resigned, Goldenberg and the Company were parties to an Amended and Restated Employment Agreement, effective as of July 1, 2015, and further amended by Amendment No. 1 to the Amended and Restated Employment Agreement, effective November 30, 2015 (the "Employment Agreement" or "EA"). In the Employment Agreement, the Company agreed to pay Goldenberg (i) a base salary, (ii) a discretionary annual bonus, (iii) equity compensation under a long-term incentive plan, and (iv) certain "Additional Incentive Compensation." *See* EA §§ 4.1 & 4.2.

3

The disputes in this case concern the Additional Incentive Compensation. In simplified terms, the Employment Agreement contemplated four types of Additional Incentive Compensation:

- **Transaction Payments.** The Employment Agreement called for Goldenberg to receive a payment based on the "Consideration" that the Company received from any third-party transaction (a "Transaction Payment"), excluding third-party financing transactions. EA § 4.2(a)(i) (the "Transaction Payment Provision").

- **Patent Royalty Payments.** The Employment Agreement called for Goldenberg to receive "Patent Lifetime Royalty Payments." EA § 4.2(a)(ii) (the "Patent Royalties Provision").

- **Undeveloped Asset Payments.** The Employment Agreement called for Goldenberg to receive a percentage of the "Consideration" that the Company received from any "Disposition" of an "Undeveloped Asset." EA § 4.2(b) (the "Undeveloped Assets Provision").

- **Minimum Payments.** The Employment Agreement called for Goldenberg to receive "Minimum Payments" of $150,000 per year, payable quarterly, as an advance against other forms of Additional Incentive Compensation. EA § 4.2(c) (the "Minimum Payment Provision").

This decision quotes the provisions when analyzing Goldenberg's claims for breach.

## B. The Fiduciary Duty Litigation

The events that led to the final order that Goldenberg seeks to enforce began in November 2016, when a hedge fund named venBio Select Advisor LLC ("VenBio") announced a proxy contest to replace the Board. In February 2017, with VenBio likely to prevail in the proxy contest, Goldenberg and his fellow directors took defensive action to protect their positions. The Board simultaneously announced that the Company had postponed its annual meeting and entered into a worldwide licensing agreement for IMMU-132 with Seattle Genetics, Inc. The Board also caused the company to sue VenBio in

4

federal court in an effort to obtain an injunction against the proxy solicitation. In response, VenBio sued Goldenberg and the other members of the Board in this court for breach of fiduciary duty. *See venBio Select Advisor LLC v. Goldenberg*, C.A. No 2017-0108-JTL (the "Fiduciary Duty Litigation").

VenBio defeated the Company's injunction application in federal court. VenBio subsequently obtained a temporary restraining order against the closing of the transaction with Seattle Genetics, Inc. The proxy contest moved forward, and VenBio's nominees prevailed. Goldenberg responded by filing an action to prevent the newly elected nominees from being seated. VenBio continued to pursue the Fiduciary Duty Litigation.

On November 2, 2020, the various parties agreed to a settlement that was filed in the Fiduciary Duty Litigation. *See* Fid. Duty Litig., Dkt. 205 (the "Settlement Stipulation" or "Stip."). Among other things, the Settlement Stipulation established terms for Goldenberg's departure from the Company. Goldenberg agreed that he would resign from all positions that he held at the Company, except that he would remain a director. *See* Stip. ¶ II.D.iv.a. In a series of sections with implications for the current litigation, the Settlement Stipulation addressed the rights that Goldenberg would possess as a result of his departure from those positions.

First, in a section entitled "Employment Agreement Payments," the Settlement Stipulation provided that Goldenberg would receive all of the "Guaranteed Payments" that he was due through the date on which his employment terminated. The operative language stated,

No later than the earlier of (A) sixty (60) days after the termination of Goldenberg's employment and (B) five (5) Business Days after the execution of this Stipulation, the Company will pay to Goldenberg his Guaranteed Payments (as defined in Section 13(b) of the Goldenberg Employment Agreement) through the date of termination of his employment.

*Id.* ¶ II.D.iv.b.1 (formatting added). "Guaranteed Payments" included "all annual Base Salary, Bonus, Minimum Payments, and Additional Incentive Compensation earned through the date of termination." EA § 13(b).

Next, the Settlement Agreement provided that the Company would make additional payments as if Goldenberg had suffered a termination "without Good Cause" after a "Change in Control," as contemplated by Section 13(c) of the Employment Agreement (the "Severance Provision"). The operative language stated,

Subject to the execution of this Stipulation and the execution and non-revocation of the release contemplated by Section II(D)(iv)(a)(3) . . . , the Company also shall make the following payments to Goldenberg in accordance with the relevant provisions of the Goldenberg Employment Agreement, for a termination without "Good Cause after a Change in Control" (as defined in the Goldenberg Employment Agreement):

(y) $1,944,121, representing a one-time Payment equal to three times Goldenberg's annual salary, and

(z) $450,000, representing a one-time payment equal to three times the minimum annual required incentive payment, in accordance with Section 13(c)(iv) of the Goldenberg Employment Agreement (the payments under clauses (y) and (z) collectively, the "Goldenberg Severance Payments").

Stip. ¶ II.D.iv.b.1 (formatting added).

Later, in a section entitled "Royalty Payments; Payments on Disposition of Undeveloped Assets; Net Revenue Payments," the Company committed to continue to comply with the Employment Agreement. The pertinent provision stated, "The Company's

obligations for royalties and other payments shall be in accordance with the Goldenberg Employment Agreement, including, without limitation, sections 4.2(a)(i) [the Transaction Payment Provision], 4.2(a)(ii) [the Patent Royalties Provision], 4.2(b) [the Undeveloped Assets Provision] and 13(c)(iv) [the Severance Provision], as applicable." *Id.* ¶ II.D.iv.d.

The court approved the settlement by entering an order and partial final judgment dated February 9, 2018. *See* Fid. Duty Litig., Dkt. 215 (the "Final Judgment"). The court found that "[t]he partial settlement of this Action as provided for in the Stipulation is approved as fair, reasonable, and adequate, and in the best interests of the Company." *Id.* ¶ 5. The Final Judgment provided that "[t]he Settling Parties are hereby authorized and directed to consummate the partial settlement of this Action in accordance with the terms and provisions of the Stipulation." *Id.* ¶ 6.

## C.     The Dispute Over The Minimum Payments

After Goldenberg's departure from the Company, a dispute arose over Goldenberg's continuing right to Minimum Payments. Before Goldenberg's resignation, the Company had made Minimum Payments to Goldenberg totaling $337,500. In addition, in November 2017, the Company had made the Goldenberg Severance Payments, which included "$450,000, representing a one-time payment equal to three times the minimum annual required incentive payment, in accordance with Section 13(c)(iv) of the Goldenberg Employment Agreement." Stip. ¶ II.D.iv.b.1 (the "Minimum Payments Severance").

After paying the Minimum Payments Severance, the Company stopped making Minimum Payments to Goldenberg. Goldenberg maintained that the Company was obligated to continue making the Minimum Payments until July 1, 2020.

7

Goldenberg and the Company also disagreed over whether the Minimum Payments Severance operated as an advance against other forms of Additional Incentive Compensation. Goldenberg claimed that the Minimum Payments Severance constituted severance, not an advance. The Company took the view that the Minimum Payments Severance consisted of Minimum Payments, making it an advance.

Goldenberg and the Company also disagreed about the time period during which the Minimum Payments operated as an advance. Goldenberg maintained that his compensation was determined on an annual basis, such that the Minimum Payments in a given year operated as an advance only against Additional Incentive Compensation received during that year. Goldenberg maintained that after the end of the year, a new measuring period started, meaning that any excess amount from his Minimum Payments that was not offset by other payments during that year no longer constituted an advance. The Company maintained that all of the Minimum Payments always operated as an advance, meaning that they could be offset against any Additional Incentive Compensation that Goldenberg received at any point in the future.

D.     The RPI Transaction

In January 2018, Immunomedics entered into a transaction with RPI Finance Trust ("RPI"). The transaction had two components: (i) a sale of common stock in the Company to RPI (the "RPI Stock Sale") and (ii) the sale of a revenue participation right in IMMU-132 to RPI (the "RPI Royalty Sale"). Each component was governed by a separate agreement, but both agreements were executed simultaneously. In this litigation, the Company asserts that the two components were part of a single transaction (the "RPI

8

Transaction"). In its filings with the SEC, however, the Company distinguished between the RPI Stock Sale and the RPI Royalty Sale and presented them as distinct albeit related transactions.[1]

In the RPI Stock Sale, the Company sold 4,272,178 shares of common stock to RPI for $75 million. The total consideration reflected a price per share that was $11 million greater than the consideration implied by the trailing fifteen-day average price of the Company's common stock.

In the RPI Royalty Sale, the Company sold a revenue participation right in IMMU-132 to RPI for $175 million. The revenue participation right gave RPI the right to receive a royalty equal to a percentage of the Company's net sales of IMMU-132.

Goldenberg maintained that he was entitled to a Transaction Payment for the RPI Transaction. By its terms, however, the Transaction Payment Provision does not entitle Goldenberg to a Transaction Payment for a third-party financing transaction (the "Financing Exception"). The Company took the position that the RPI Transaction fell within the Financing Exception. The Company has not paid Goldenberg any amounts for the RPI Transaction.

---

[1] *See* Immunomedics Form 10-Q, February 8, 2018, https://www.sec.gov/Archives/edgar/data/0000722830/000155837018000528/immu-20171231x10q.htm (last visited Apr. 14, 2021).

**E.     The Roger Williams Settlement**

In October 2018, the Company settled a lawsuit it had filed in the United States District Court for the District of New Jersey against Roger Williams Medical Center and other defendants. In that lawsuit, the Company asserted that the defendants had infringed the Company's patents and misappropriated its intellectual property for decades while developing an antibody called MN-14. The Company argued that the years of misappropriation resulted in Roger Williams creating research and developing products.

After three years of litigation, the parties entered into a settlement and release agreement (the "Roger Williams Settlement"). Under the Roger Williams Settlement, the defendants paid the Company $2.4 million. In exchange, the Company released all claims and dismissed the lawsuit.

Goldenberg maintained that he was entitled to a payment based on the Roger Williams Settlement under the Undeveloped Assets Provision. Goldenberg asserted that by releasing its claims against Roger Williams relating to the antibody MN-14, the Company effectively transferred an Undeveloped Asset, entitling Goldenberg to a payment. The Company has disputed that claim and has not paid Goldenberg any compensation related to the Roger Williams Settlement.

**F.     The Janssen Transaction**

In January 2019, the Company entered into a transaction with Janssen Biotech, Inc. in which the Company agreed to promote Janssen's products in exchange for fees totaling at least $295,000 (the "Janssen Transaction"). Goldenberg claimed that he was entitled to a Transaction Payment for the Janssen Transaction

10

The Company refused to provide Goldenberg with a Transaction Payment for the Janssen Transaction. The Company maintains that the Janssen Transaction involves services and does not trigger the right to a Transaction Payment. Goldenberg has not received any compensation related to the Janssen Transaction.

**G.      The Everest Transaction**

In April 2019, the Company granted Everest Medicines Limited an exclusive license to commercialize IMMU-132 within a certain geographic territory. The consideration for the license included an upfront payment of $65 million, milestone payments, and royalties of 14% to 20% on net sales (the "Everest Transaction").

Goldenberg asserted that he was entitled to Additional Incentive Compensation for the Everest Transaction. The Company agreed that the upfront payment warranted a Transaction Payment, but the Company credited the amounts due against the Minimum Payments that Goldenberg has already received, including the Minimum Payments Severance. As a result, Goldenberg did not receive any money.

On March 18, 2021, the Company made a Transaction Payment to Goldenberg for $150,000, reflecting a subsequent payment from Everest to the Company. Goldenberg has asserted that this amount was insufficient and that he is entitled to $450,000.

**H.      The Quarterly And Annual Reports**

Under the Employment Agreement, Goldenberg was and remains entitled to quarterly and annual reports from the Company so that he can verify that the Company is complying with its payment obligations. Goldenberg maintains that the Company failed to provide him with a quarterly report for the quarter ending June 30, 2019. On July 16, 2019,

Goldenberg sent a letter to the Company, asking for the report and for documents that Goldenberg deemed reasonably necessary to verify Immunomedics' calculations for Additional Incentive Compensation. The Company did not send the report or provide the documents.

The Company subsequently failed to provide Goldenberg with the report for the quarter ending September 30, 2019. The Company also failed to provide Goldenberg with the annual report for the fiscal year ending December 30, 2019. And the Company failed to provide Goldenberg with the report for the quarter ending March 31, 2020.

It was not until September 18, 2020, that the Company provided Goldenberg with the report due for the quarter ending June 30, 2019. Since then, the Company has provided Goldenberg with the required quarterly reports. The Company still has not provided Goldenberg with annual reports or the documents he requested.

On November 15, 2020, another quarterly report was due. The Company failed to provide it in a timely manner.

Goldenberg also maintained that the reports that the Company has provided lack information required by the Employment Agreement. For example, the reports did not list the Company's net revenue. They also omitted relevant transactions, such as the RPI Transaction.

On March 15, 2021, the most recent quarterly report came due. The Company did not send it on time. The Company did not provide that report until March 19, 2021, less than an hour before the hearing on the Company's motion to dismiss.

## I. This Litigation

On May 5, 2020, Goldenberg moved to enforce the Final Judgment in the Fiduciary Duty Litigation. Immunomedics opposed Goldenberg's motion, claiming that Goldenberg should be required to file a new action.

The court agreed with the Company. On June 26, 2020, the court entered an order denying Goldenberg's motion to enforce and providing the following explanation:

> The motion is denied without prejudice to the rights that it seeks to assert. When an action has been settled and the settlement implemented by court order, the court may entertain a motion to enforce that order either as an adjunct to the action that was settled or through a new action. The appropriate route depends on both the facts and the nature of the rights asserted. *Rainbow Navigation, Inc. v. Yonge*, C.A. No. 9432, ltr. op. at 3–4 (Del. Ch. Dec. 16, 1988). The rights asserted in the motion are in the nature of new claims based on facts that arose after the settlement was reached. Those rights should be asserted in a complaint and litigated under established procedural rules. There are no settled rules for conducting discovery, holding a merits hearing, and entering a judgment in connection with a motion to enforce. *See Yucaipa Corp. Initiatives Fund I, LP v. Follieri Grp. LLC*, 2008 WL 638273, at *1 (Del .Ch. Feb. 27, 2008). While this may seem like an unnecessary legal nicety to the movant, it will assist the parties and the court in managing the ensuing proceeding. It will also enable the parties to keep their proceeding distinct from the ongoing litigation in this civil action. In granting this order, the court expresses no view on the merits of the rights asserted, nor on the applicability of the forum selection clause in the release.

Fid. Duty Litig., Dkt. 337.

Three days later, Goldenberg brought this action. The complaint contains three counts:

- Count I seeks to enforce the Final Judgment. It does so by purporting to assert a claim for civil contempt against the Company for violating the Final Judgment.

- Count II asserts a claim for breach of the Employment Agreement.

13

- Count III seeks declaratory judgments regarding the Company's alleged obligations under the Employment Agreement.

The Company has moved to dismiss the complaint in its entirety.

## II. THE MOTION TO DISMISS COUNTS I AND II

The Company has moved to dismiss Counts I and II of the complaint under Rule 12(b)(6) for failure to state a claim on which relief can be granted. In seeking to dismiss Count I, the Company argues that Goldenberg has framed his count improperly as a claim for civil contempt, which is not a cause of action. In seeking to dismiss Count II, the Company contends that it is not reasonably conceivable that any of Goldenberg's contractual theories could entitle him to relief.

When considering a Rule 12(b)(6) motion, the court (i) accepts as true all well-pleaded factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiffs. *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011). The court need not, however, "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party." *Price v. E.I. DuPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).

When ruling on a Rule 12(b)(6) motion, "the court may consider, for certain limited purposes, the content of documents that are integral to or are incorporated by reference into the complaint." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 139 (Del. Ch. 2003). "[A] complaint may, despite allegations to the contrary, be dismissed where the

14

unambiguous language of documents upon which the claims are based contradict the complaint's allegations." *Id.* at 139; *see also Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001) ("[A] claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law.").

"[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'" *Cent. Mortg.*, 27 A.3d at 535. "The reasonable conceivability standard asks whether there is a possibility of recovery." *Garfield v. BlackRock Mortg. Ventures, LLC*, 2019 WL 7168004, at *7 (Del. Ch. Dec. 20, 2019) (citing *Cent. Mortg.*, 27 A.3d at 537 n.13 ("Our governing 'conceivability' standard is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'")). Dismissal is inappropriate "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances." *Cent. Mortg.*, 27 A.3d at 535.

## A.    Count I: The Claim To Enforce The Final Judgment

In Count I of the complaint, Goldenberg seeks to enforce the Final Judgment. Goldenberg previously sought the same relief when moving to enforce the Final Judgment in the Fiduciary Duty Litigation. In this action, however, Goldenberg inartfully titled his claim as "Count I: Civil Contempt." That label led the Company to observe that civil contempt is not a cause of action and to argue that Count I should be dismissed.

As several federal decisions have held, "there is no such thing as an independent cause of action for civil contempt."[2] Federal decisions teach that contempt proceedings generally take place in the original action in which the order was entered.[3] Once a party has taken the step of pursuing a motion to enforce, the court has "considerable latitude" in determining "how it goes about enforcing its own decrees." *Rockwell*, 91 F.3d at 920. The federal courts typically proceed in a "more summary fashion" when adjudicating contempt than in an "independent civil action." *D. Patrick*, 8 F.3d at 459.

Precedent from this court likewise holds that the proper method of enforcing an order is by filing a motion in the case in which the order was entered.[4] Our precedent also

---

[2] *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 459 (7th Cir. 1993) (quoting *Blalock v. United States*, 844 F.2d 1546, 1550 (11th Cir. 1988) (per curiam)); *accord, e.g.*, *Wilridge v. Kernan*, 2018 WL 2431634, at *5 (N.D. Cal. May 30, 2018); *Hilton v. Wash. Mut. Bank*, 2009 WL 3485953, at *6 (N.D. Cal. Oct. 28, 2009); *Hurst v. City of Dover*, 2008 WL 2486458, at *4 (D. Del. Apr. 17, 2008), *report and recommendation adopted*, 2008 WL 2421468 (D. Del. June 16, 2008)

[3] *See Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 91 F.3d 914, 920 (7th Cir. 1996). That said, a majority of federal courts have recognized that at least one form of action for contempt—a civil cause of action seeking equitable relief for knowingly disclosing matters occurring before a grand jury—can be asserted through a separate complaint. *See, e.g.*, *Barry v. United States*, 865 F.2d 1317, 1321 (D.C. Cir. 1989) (collecting authorities).

[4] *See T.R. Invs., LLC v. Genger*, 2012 WL 5471062, at *3 (Del. Ch. Nov. 9, 2012); *In re Tyson Foods, Inc.*, 919 A.2d 563, 598 (Del. Ch. 2007); *see also* Ct. Ch. R. 71 ("When an order is made in favor of a person who is not a party to the action, that person may enforce obedience to the order by the same process as if that person were a party, and, when obedience to an order may be lawfully enforced against a person who is not a party, that person is liable to the same process for enforcing obedience to the order as if that person were a party.").

teaches that the court must determine in each case what procedures are warranted to decide the motion to enforce. *See Tyson Foods*, 919 A.2d at 598–99.

The parties have not cited any authority to suggest that once a party has moved to enforce the order in the underlying action, the court cannot require the party to seek that relief by filing a separate action. As the Company argued when confronted with Goldenberg's motion to enforce, such an approach can have procedural advantages for the alleged contemnor, particularly when the motion to enforce presents complex issues. For example, the defendant can seek a pleading-stage ruling on the scope of the obligations imposed by the order, potentially avoiding the need for discovery and an evidentiary hearing. And if the court denies the pleading-stage motion, then the parties can litigate using the procedures contemplated by the Court of Chancery Rules. Doing so avoids the need for the court to create a bespoke procedure to address the motion to enforce.

Goldenberg followed the teachings of precedent by moving to enforce the Final Judgment in the Fiduciary Duty Litigation. The Company responded by arguing that Goldenberg instead should advance his contentions by filing a new action. The Company argued that Goldenberg's theories were "fact-intensive, involve[d] complex issues, and could have a substantial impact on Immunomedics," warranting the more extensive proceedings that a new case would involve. *See* Fid. Duty Litig., Dkt. 17 at 9. Relatedly, the Company argued that the type of summary proceedings typically used for adjudicating a motion to enforce "would prevent Immunomedics from presenting an adequate defense." *Id.* The Company went so far as to argue that any attempt by the court to adjudicate the motion to enforce in the underlying action would "deprive [the Company] of due process."

17

*Id.* at 4. The Company maintained that instead, Goldenberg should be required to file the motion to enforce "as a new action" so that Immunomedics would "have an opportunity to move to dismiss the claims asserted and, should that motion be denied, an opportunity to take discovery and present expert testimony." *Id.* at 14.

The court accepted the Company's arguments and required that Goldenberg refile his motion as a separate case. Goldenberg promptly complied. After Goldenberg took those steps, the Company changed its tune.

Now, in its motion to dismiss, the Company interprets *Tyson Foods* as holding that a claim to enforce an order *never* can be asserted in a new action, even if the party proceeded as Goldenberg did. In addition to reversing its prior position, the Company's argument discounts the far more limited procedural history of *Tyson Foods*. There, stockholder plaintiffs contended that the defendants had breached a settlement entered in a prior derivative action, and they filed a complaint, which contained a cause of action that sought to enforce the order approving the settlement. *See Tyson Foods*, 919 A.2d at 598. The stockholder plaintiffs had not first attempted to enforce the order in the underlying case. Noting that stockholder plaintiffs "faced no impediment in pursuing contempt," the court held that the stockholder plaintiffs first should have filed a motion to enforce in the underlying case. *Id.* The *Tyson Food* case did not involve a situation in which the plaintiffs originally moved to enforce the order, only to face a request by the alleged contemnors to require them to file a new action, followed by the court granting the requested relief.

Given how the current case has unfolded, it would be inequitable to dismiss Count I on the theory that Goldenberg cannot seek to enforce the Final Judgment in a new action.

The Company asked for an order requiring Goldenberg to file a new action, and it got what it wanted. The current posture does not inflict any prejudice on the Company. To the contrary, the current posture enabled the Company to file a pleading-stage motion to dismiss, and it will facilitate discovery and a merits hearing. The Company thus has benefitted from having Goldenberg file a new action. There is no reason to dismiss Count I on procedural grounds.

The Company separately argues that even if Goldenberg can seek to enforce the Final Judgment on the facts of the case, the claim should be dismissed because the Final Judgment did not provide clear notice of the proscribed conduct. The Company argues that if it had a good faith dispute over its obligations under Employment Agreement, then it cannot be held in contempt.

To support a sanction of for civil contempt, "the order allegedly violated [must] give clear notice of the conduct being proscribed." *Mother Afr. Union First Colored Methodist Protestant Church v. Conf. of Afr. Union First Colored Methodist Protestant Church*, 1992 WL 83518, at *9 (Del. Ch. Apr. 22, 1992). In this case, the Final Judgment approved the Settlement Stipulation, which plainly provided that the Company would comply with its obligations under the Employment Agreement. The Company thus had clear notice of its commitment and what it was required to do.

The fact that the Company committed to comply with the Employment Agreement does not mean that any breach of the Employment Agreement will warrant enforcement through a civil contempt sanction. Whether to grant that remedy is always a discretionary matter for the court. As to provisions where the Employment Agreement is ambiguous or

19

where the Company had a good-faith basis to dispute the plain meaning of its terms, the Company will have a valid defense. Some of the language of the Employment Agreement, however, seems sufficiently clear to support a potential enforcement remedy in light of the allegations of the complaint. It is reasonably conceivable, for example, that the Company knowingly disregarded its obligations to provide quarterly and annual reports. If the Company acted contumaciously, then Goldenberg may be able to obtain a compensatory sanction, such as an order awarding him enforcement costs, including attorneys' fees. Count I therefore states a claim on which relief can be granted.

## B.     Count II: The Claim For Breach Of The Employment Agreement

In Count II of the complaint, Goldenberg asserts claims for breach of the Employment Agreement. Goldenberg identifies six breaches. Five relate to Additional Incentive Compensation that Goldenberg claims he is due. The sixth relates to Goldenberg's rights to quarterly reports, annual reports, and related documents.

### 1.     Principles Of Contract Interpretation

The Employment Agreement specifies that New Jersey law governs its terms. *See* EA § 17. "Delaware courts will generally honor a contractually-designated choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction." *J.S. Alberici Constr. Co. v. Mid-West Conveyor Co.*, 750 A.2d 518, 520 (Del. 2000). The Company's principal place of business is in New Jersey, satisfying the material relationship requirement.

Under New Jersey law, a party asserting a claim for breach of contract must plead four elements: (i) the existence of a contract, (ii) that the plaintiff performed under the

20

contract's terms, (iii) that the defendant failed to perform, and (iv) that the defendant's failure to perform "caused a loss to the plaintiff." *Woytas v. Greenwood Tree Experts, Inc.* 206 A.3d 386, 392 (N.J. 2019). "To determine the meaning of the terms of an agreement by the objective manifestations of the parties' intent, the terms of the contract must be given their 'plain and ordinary meaning.'" *Kaufman v. Provident Life & Cas. Ins. Co.*, 828 F. Supp. 275, 283 (D.N.J. 1992) (quoting *Armco Inc. v. Glenfed Fin. Corp.*, 746 F. Supp. 1249, 1252 (D.N.J. 1990)). An ambiguity in the contract's terms exists if there are "at least two reasonable alternative interpretations." *Schor v. FMS Fin. Corp.*, 814 A.2d 1108, 1112 (N.J. Super. Ct. App. Div. 2002) (internal quotation marks omitted).

Although New Jersey law governs the substance of the contractual dispute, Delaware law governs the procedural issues. *See MPEG LA, L.L.C. v. Dell Glob. B.V.*, 2013 WL 812489, at *3 (Del. Ch. Mar. 6, 2013). "At the motion to dismiss stage, ambiguous contract provisions must be interpreted most favorably to the non-moving party." *Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *8 (Del. Ch. Sept. 18, 2014). Dismissal under Rule 12(b)(6) is improper unless "the [defendant's] interpretation is the *only* reasonable construction as a matter of law." *VLIW Tech. LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003) (emphasis in original). The law of the forum also governs remedial issues, unless the question of remedy is bound closely to the rule of substantive law. *See generally Naughty Monkey LLC v. Marinemax Ne. LLC*, 2010 WL 5545409, at *8 n.59 (Del. Ch. Dec. 23, 2010) (summarizing applicable principles).

## 2. The Breaches Of The Transaction Payment Provision

Goldenberg contends that Immunomedics breached the Transaction Payment Provision by failing to provide him with Transaction Payments for the RPI Stock Sale, the RPI Royalty Sale, the Janssen Transaction, and the Everest Transaction. It is reasonably conceivable that Goldenberg is entitled to a Transaction Payment for the RPI Royalty Sale and the Everest Transaction. It is not reasonably conceivable that Goldenberg is entitled to a Transaction Payment for the RPI Stock Sale or the Janssen Transaction.

### a. The Meaning Of The Transaction Payment Provision

The Transaction Payment Provision provides as follows:

> With respect to any fiscal year during the Term of the Agreement in which Immunomedics records an annual net loss . . . , Immunomedics will pay to Dr. Goldenberg a sum equal to three quarters of one percent (.75%) of the total Consideration the Company receives from any third party transaction, excluding third party financing transactions and any Disposition of Undeveloped Assets. With respect to any fiscal year during the Term of the Agreement in which Immunomedics records positive net income . . . Immunomedics will pay to Dr. Goldenberg a sum equal to one and one-half percent (1.5%) of Immunomedics' Annual Net Revenue . . . for each such fiscal year (unless Dr. Goldenberg's employment terminates pursuant to Sections 10 (a) or 10(e)), and thereafter throughout the noncompetition period . . . .

EA § 4.2(a)(i).

Several important terms in the Transaction Payment Provision are not defined. For starters, the term "third party transaction" is not defined, and its plain language is expansively broad. As framed, it covers any transaction involving a third party in which the Company receives "Consideration."

The term "Consideration" is defined as follows:

Cash, asset(s) or property, tangible or intangible, which Immunomedics receives directly or indirectly, for a Disposition (the transfer of relevant assets), including but not limited to sales proceeds, license fees and licensing milestones, other milestone payments, up-front fees and sales bonuses.

Consideration shall not include

(A) any consideration for or with respect to any Acquired Asset,

(B) amounts paid to Immunomedics which clearly are intended to constitute reimbursement of direct out-of-pocket costs incurred by Immunomedics for research, development or preclinical or clinical trials of the product or products which are the subject of the Disposition, regardless of whether paid directly or indirectly, and however labeled, provided such amounts are paid pursuant to an agreement in effect at the time of such payment(s), and

(C) any Patent Lifetime Royalty Payments. . . .

In calculating the value of Consideration received in a Disposition, Immunomedics will offset the value of anything of value that it had to grant or provide to the other party in exchange for the Disposition as an express element of the transaction.

EA § 4.2(d)(iii) (formatting added).

The definition of Consideration thus frames the term as referring to something the Company receives in a "Disposition." The Employment Agreement defines the term "Disposition" to mean "any transfer, by way of sale, license or otherwise, to an unaffiliated third party, of any of Immunomedics' right, title or interest in or to any one or more of its products, technologies, intellectual property, businesses or other assets." EA § 4.2(d)(iv).

Read as a whole, the Transaction Payment Provision entitles Goldenberg to a Transaction Payment based on the Consideration that the Company receives in any Disposition. At the same time, under the Financing Exception, Goldenberg is not entitled to any compensation for a "third party financing transaction." That term is not defined, but

its plain language necessarily would include customary transactions in which the Company raised debt by borrowing from a third party or raised equity capital by selling stock to a third party. This contractual framework governs the RPI Stock Sale, the RPI Royalty Sale, and the Janssen Transaction.

### b. The RPI Stock Sale

Goldenberg claims that the Company breached the Transaction Payment Provision by failing to pay him a Transaction Payment for the RPI Stock Sale. He concedes that the RPI Stock Sale fell within the Financing Exception, but he maintains that the Company received $11 million more for the shares than warranted by the market price. Goldenberg maintains that he is entitled to a Transaction Payment based on the $11 million delta.

Goldenberg's approach implicitly treats the shares as an "asset" of the Company such that their issuance constituted a Disposition, then looks to the definition of Consideration to determine the value that the Company received. That definition calls on the Company to "offset the value of anything of value that it had to grant or provide to the other party in exchange for the Disposition." Goldenberg thus subtracts the market value of the shares that the Company had to provide from the amount of consideration that the Company received, resulting in net Consideration of $11 million.

The difficulty with Goldenberg's analysis is that it fails to give any meaning to the Financing Exception. Although the term "third party financing transaction" is undefined, the plain meaning of those words should include a customary equity issuance. Indeed, when read in the context of the Transaction Payment Provision as a whole, the Financing Exception seems designed to foreclose precisely the analysis that Goldenberg undertakes.

24

Goldenberg has conceded that the Financing Exception covers a transaction in which the Company raises equity financing by selling shares. With Goldenberg having made that concession, it is not reasonably conceivable that the Transaction Payment Provision operates as if the Financing Exception did not exist. To the extent that Goldenberg asserts a claim for breach of the Transaction Payment Provision relating to the RPI Stock Sale, that claim is dismissed.

### c. The RPI Royalty Sale

Goldenberg next argues that the Company breached the Transaction Payment Provision by failing to pay him a Transaction Payment for the RPI Royalty Sale. It is reasonably conceivable that the Transaction Payment Provision covers the RPI Royalty Sale, resulting in a viable claim for breach. There is no dispute that the RPI Royalty Sale qualifies as a third party transaction; the question is whether it falls within the Financing Exception.

The Company argues that the Financing Exception applies. The Company points out that a revenue participation right can be a form of financing. The Company observes out that it received $175 million in return for making a stream of royalty payments over time, which is analogous to a long-term factoring arrangement. That is a reasonable reading of the Financing Exception, but it is not the only possible reading.

Goldenberg responds with a reasonable reading of his own. Under his interpretation, the Financing Exception applies to traditional forms of equity and debt financing, but not to transactions that result in a permanent transfer of rights in specific Company assets. In the RPI Royalty Sale, the Company sold an intangible asset—the right to a portion of the

25

net revenue generated by IMMU-132—in return for an upfront payment. The sale involved IMMU-132, the Company's crown-jewel asset, and it prevented the Company from selling IMMU-132 as a whole to a different party. The Company also could not sell the same revenue stream to a different party. Goldenberg thus argues that the RPI Royalty Sale constituted a sale, not a financing transaction. Goldenberg's interpretation finds support in the Company's SEC filings, which notably referred to the RPI Stock Sale, but not the RPI Royalty Sale, as "the 'Financing.'"

Both interpretations of the Financing Exception are reasonable. At this stage of the case, the court cannot choose between two reasonable interpretations. *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996).

Unable to foreclose Goldenberg's challenge to the RPI Royalty Sale as a separate transaction, the Company argues that both components of the RPI Transaction must be viewed together. The Company maintains that when treated as a single, unitary transaction, the RPI Transaction falls within the Financing Exception. The Company relies on a New Jersey decision, which held that when two agreements "were executed on the same day, pertain to the control and management of the same company, and contain . . . cross-references," they should be considered "part and parcel of the same transaction." *Victory Ent., Inc. v. Schibell*, 2018 WL 3059696, at *9 (N.J. Super. Ct. App. Div. June 21, 2018) (internal quotation marks omitted).

The principle that two related agreements can be considered together when interpreting the contracts is non-controversial, but it is not dispositive for purposes of determining whether the RPI Transaction constitutes a single transaction. It is reasonably

conceivable that the latter issue is a question of fact, rather than a question of contract interpretation. It is also reasonably conceivable that the court would treat the RPI Royalty Sale as a distinct sale of property rights in IMMU-132, consistent with how the Company described the transaction in its public filings.

Goldenberg has articulated a reasonable reading of the Transaction Payment Provision. His claim for a Transaction Payment based on the RPI Royalty Sale thus survives the motion to dismiss.

### d. The Janssen Transaction

Goldenberg next contends that the Company breached the Transaction Payment Provision by failing to provide him with a Transaction Payment for the Janssen Transaction. It is not reasonably conceivable that Goldenberg is entitled to a Transaction Payment for the Janssen Transaction.

Read as a whole, the Transaction Payment Provision contemplates that the Company will make a payment to Goldenberg if the Company receives Consideration as part of a Disposition. The cash that the Company received in the Janssen Transaction does not qualify as Consideration because it did not result from a Disposition. The Company did not transfer its right to, title for, or interest in any of its products, technologies, intellectual property, businesses, or other assets. Rather, the Company received payments from Janssen for providing product promotion services.

Goldenberg responds creatively that by providing product promotion services, the Company seconded its marketing department and sales force to Janssen, resulting in a transfer of rights to its business and bringing the Janssen Transaction within the scope of

27

the Transaction Payment Provision. But a sale of a business or the transfer of a right to a business is a well-understood concept that does not encompass a contractual commitment to promote a product. It is not reasonably conceivable that the Janssen Transaction could trigger a Transaction Payment. Goldenberg's claim that the Company breached the Transaction Payment Provision in connection with the Janssen Transaction is dismissed.

### e. The Everest Transaction

In his final claim for breach of the Transaction Payment Provision, Goldenberg contends that the Company failed to provide him with Transaction Payments for the Everest Transaction. Unlike with the other disputed transactions, the Company agrees that the Everest Transaction triggered a Transaction Payment. The Company maintains instead that it does not yet owe any additional money to Goldenberg because his past Minimum Payments operated as advances against future Additional Incentive Compensation. The Company therefore offset those amounts against the payments due for the Everest Transaction. The dispute over the Everest Transaction is thus a dispute about the Minimum Payments Provision.

> The pertinent language of the Minimum Payments Provision states,
>
> Immunomedics agrees to make a minimum payment of One Hundred Fifty Thousand Dollars ($150,000) to Dr. Goldenberg during each of Immunomedics' fiscal years during the Term of this Agreement, payable in equal quarterly payments, as an advance against the amounts due to Dr. Goldenberg [for other forms Additional Incentive Compensation]. This minimum payment shall be prorated for any partial fiscal year of Immunomedics or partial year of service of Dr. Goldenberg . . . .

EA § 4.2(c).

The Company and Goldenberg disagree about three aspects the Minimum Payments Provision. Those disputes are (i) whether the Minimum Payments operate as an advance only against Additional Incentive Compensation received during the same year as the Minimum Payments, (ii) whether the Minimum Payments Severance constituted an advance, and (iii) whether the Company was obligated to continue making Minimum Payments after Goldenberg left the Company.

### i. The Same-Year Issue

The first issue is whether the Minimum Payments operate as an advance against Additional Incentive Compensation received only during the same year as the Minimum Payments. Goldenberg argues that his compensation is calculated on an annual basis and that therefore any Minimum Payments only offset any Additional Incentive Compensation based on "Consideration" received in the same year. The Company argues that the Minimum Payments constitute advances against any Additional Incentive Compensation, whenever received.

The Company's interpretation accurately captures the plain language of the Minimum Payments Provision. That provision states that the Minimum Payments act "as an advance against the amounts due." There is no language in the Minimum Payments Provision that places a temporal limit on the advance. There is also no reason to think that the Minimum Payments would only operate as an advance within a single calendar year. Such an interpretation would create counterintuitive results, because as the year went on and there was less time for Goldenberg to receive Additional Incentive Compensation, it would be less likely that each quarterly Minimum Payment would function as an advance.

The Minimum Payment made in the fourth quarter of the year likely would function as a straightforward payment, rather than an advance, simply because there would be little time for any offsetting Additional Incentive Compensation. The Company's ability to offset the Minimum Payments also would become dependent on accidents of timing. For instance, Additional Incentive Compensation that became due on December 31 could be offset with Minimum Payments from that year, and yet Additional Incentive Compensation that became due on January 1 of the following year could not.

Goldenberg's interpretation of the Minimum Payment Provision is not reasonably conceivable. The Minimum Payments operate as an advance against any future Additional Incentive Compensation. They are not limited to operating as an advance against Additional Incentive Compensation received only during the same calendar year.

### ii. The Dispute Over The Minimum Payments Severance

Goldenberg next argues that the Minimum Payments Severance was not an advance. The Company observes that the Minimum Payments Severance was calculated based on three times the annual Minimum Payment, inferring that the Minimum Payments Severance necessarily was an advance. In this instance, the plain language of the relevant provisions supports Goldenberg's interpretation and rules out the Company's reading.

Under the Settlement Stipulation, the Company agreed to pay the Goldenberg Severance Payments, including "$450,000, representing a one-time payment equal to three times the minimum annual required incentive payment, in accordance with Section 13(c)(iv) of the Goldenberg Employment Agreement." Stip. ¶ II.D.iv.b.1. The Settlement Stipulation thus contemplated that the $450,000 would constitute a "one-time payment,"

30

not an advance. Although the formula for calculating the one-time payment was "three times the minimum annual required incentive payment," the Settlement Stipulation did not define the one-time payment as a Minimum Payment, nor did the Settlement Stipulation indicate that the one-time payment would operate as if it were comprised of three annual Minimum Payments.

The Settlement Stipulation also provided that the "one-time payment" of $450,000 would be paid "in accordance with Section 13(c)(iv) of the Goldenberg Employment Agreement." That section states,

> If Immunomedics terminates Dr. Goldenberg's employment without Good Cause . . . Immunomedics will pay Dr. Goldenberg a Severance payment, paid in a lump sum, in an amount equal to three times (3x) his Total Annual Compensation (as such exists as of the date of termination), such lump sum to be paid within sixty (60) days following the date of termination of Dr. Goldenberg's employment. "Total Annual Compensation" shall include all cash payments due to Dr. Goldenberg for the applicable Contract Year as set out in Sections 4.l(a) and (b), Section 4.1(a)(i) [the Transaction Payment Provision], and Section 4.1(c) [the Minimum Payments Provision] but shall not include payments provided pursuant to Sections 4.2(a)(ii) and 4.2(b) (which shall continue pursuant to the terms of those Sections).

The plain language of the Employment Agreement thus referred to the payment as part of a "Severance payment" that was "paid in a lump sum." Like the Settlement Stipulation, the provision established a formula for the Severance payment equal to three times Total Annual Compensation, and the definition of Total Annual Compensation included amounts due under the Minimum Payments Provision. The formula referred to these amounts, however, only to generate the "lump sum" that would be paid as the "Severance payment." The plain language of the Employment Provision did not specify that any component of the Severance payment operated as an advance.

31

The Company argues that the component of the Severance payment associated with the Minimum Payments necessarily constituted an advance because those payments were "incorporated into the severance calculation in [their] entirety." Dkt. 18 at 29. That is not an accurate reading of the Settlement Stipulation or the Employment Agreement. Both used the Minimum Payments Provision to calculate a figure that then was paid in a lump sum, as a one-time payment.

The plain language of the Settlement Stipulation establishes that the Minimum Payments Severance was a severance payment and not an advance. The Company's motion to dismiss this aspect of Goldenberg's complaint is denied.

### iii. The Obligation To Continue Making Minimum Payments

The last dispute involves how long the Company was obligated to continue making the Minimum Payments. Goldenberg argues that the Company was obligated to continue through the Contract Term, which lasted through July 1, 2020. The Company argues that its obligation ended when Goldenberg left the Company in November 2017.

The plain language of the Minimum Payments Provision required the Company to make Minimum Payments "during each of Immunomedics' fiscal years during the Term of this Agreement." EA § 4.2(c). Section 2 of the Employment Agreement described the term of the Employment Agreement as follows: "Unless earlier terminated by either party pursuant to Section l0, this Agreement will continue for a five (5) year period (through July 1, 2020)." Absent earlier termination in accordance with Section 10, the Company thus was obligated to make Minimum Payments until July 1, 2020.

32

Section 10 of the Employment Agreement identifies the following means by which the Employment Agreement could be terminated before July 1, 2020:

> Notwithstanding the provisions of Section 2 above, the employment of Dr. Goldenberg shall terminate upon the happening of any of the following events:
>
> (a) The death of Dr. Goldenberg.
>
> (b) Immunomedics and Dr. Goldenberg mutually agree to terminate this Agreement.
>
> (c) At Immunomedics' option, if Dr. Goldenberg suffers a Permanent Disability. . . .
>
> (d) By Dr. Goldenberg, for Good Reason. . . .
>
> (e) By the Company for "Good Cause" . . . .

None of these events took place. Instead, the parties agreed that Goldenberg's departure was a termination "Without Good Cause After a Change in Control," which is not one of the grounds for shortening the Contract Term under Section 10. Consequently, under the plain language of the Minimum Payments Provision, the Company was obligated to continue making the Minimum Payments through July 1, 2020.

The Company responds that the Minimum Payments Provision contemplates that the "minimum payment shall be prorated for any partial fiscal year of Immunomedics or partial year of service of Dr. Goldenberg . . . ." EA § 4.2(c). The Company contends that the language about a "partial year of service" would become surplusage if the obligation to make Minimum Payments continued beyond the termination Goldenberg's service. That is incorrect because Section 10 of the Employment Agreement identifies five means by which the Employment Agreement could terminate before the full Contract Term. Any one

33

of those means would cause the obligation to make Minimum Payments to cease and could result in a partial year of service. A termination "Without Good Cause After a Change in Control," however, does not cause the obligation to cease and thus does not result in a partial year of service.

Goldenberg's interpretation of the Minimum Payments Provision is the only reasonable reading. This aspect of the dispute relating to the Minimum Payments Provision survives the motion to dismiss.

### 3. The Breach Of The Undeveloped Assets Provision

In his penultimate claim for breach of contract, Goldenberg contends that Immunomedics failed to comply with the Undeveloped Assets Provision by withholding a payment based on the Roger Williams Settlement. That theory states a claim on which relief could be granted.

The Undeveloped Assets Provision provides as follows:

> In the event the Company . . . completes a Disposition during the Term of Employment, or within three (3) years thereafter, of any one or more of Immunomedics' Undeveloped Assets for which Dr. Goldenberg was an Inventor, Immunomedics will pay Dr. Goldenberg . . . a sum equal to at least twenty percent (20%) . . . of the Consideration Immunomedics receives from each Disposition, upon receipt . . . . Subject to the preceding conditions, the Company's obligation to compensate Dr. Goldenberg . . . under this provision, if any, applies to all Dispositions completed within the Term of Employment or within three (3) years thereafter, even if the Company actually receives the Consideration at some time after the three (3) year period elapses.

EA § 4.2(b). The Employment Agreement defines "Undeveloped Asset" broadly as

> any technology, product, agent, intellectual property, business or other asset(s) or product(s) for which, at the time of Disposition, the Board . . . and Dr. Goldenberg have mutually determined that Immunomedics (A) is not

34

currently budgeting for development, (B) Has not set a time table for development . . . , (c) has not funded with substantial research and development resources, or (D) has not entered Immunomedics' sponsored Phase I or Phase II clinical trials.

*Id.* § 4.2(d)(ix).

Under the Roger Williams Settlement, the Company released all claims against the defendants for their misappropriation of the antibody MN-14 in exchange for $2.4 million. It is reasonably conceivable that that antibody MN-14 was an Undeveloped Asset for purposes of the Employment Agreement. The Company argues that even if that is true, the Roger Williams Settlement could not have been a Disposition. The Company views a Disposition as limited to a traditional sale, rather than as potentially encompassing a settlement.

Goldenberg contends that the Roger Williams Settlement could qualify as a Disposition under the Employment Agreement because Immunomedics "effectively conveyed its intellectual property rights" to the defendants in exchange for $2.4 million. Compl. ¶ 29. Goldenberg argues that the settlement was a "transfer by way of sale, license or otherwise," and therefore constituted a Disposition. Dkt. 35 at 54–55.

It is reasonably conceivable that a settlement resulting in the release of any claims to a form of property could constitute a transfer of that property under broad contractual language like the Undeveloped Assets Provision. This concept is perhaps easier to understand using a physical asset. Hypothetically, if Roger Williams had taken a piece of Immunomedics' laboratory equipment, then Immunomedics could have asserted a claim for conversion. If Immunomedics subsequently released all of its claims to the laboratory

35

equipment in exchange for a settlement payment, the net result would be a "transfer by way of sale, license or otherwise." If Immunomedics received the market value of the equipment in return for the release, then the outcome would be no different than a sale.

The Company argues that it incurred fees and expenses suing Roger Williams, making it inappropriate to consider the settlement payment as consideration in return for a transfer of rights to an undeveloped asset. That argument goes to the value of the consideration that the Company received. It does not defeat the threshold possibility that the settlement could be a transfer that would entitle Goldenberg to a Transaction Payment.

Whether the Roger Williams Settlement constituted a Disposition of an Undeveloped Asset cannot be determined at this stage of the case. Discovery may show that the settlement did not result in a Disposition, or that the value of the Company's outlay in the litigation exceeded what it received. For present purposes, it is reasonably conceivable that the Company's failure to make a payment to Goldenberg for the Roger Williams Settlement constitutes a breach of the Undeveloped Assets Provision. The Company's motion to dismiss this aspect of Count II is therefore denied.

### 4. The Breach Of The Reporting Provisions

In his final claim for breach, Goldenberg alleges that Immunomedics violated the Employment Agreement by failing to provide the quarterly and annual reports and documents to which he was entitled. The complaint plainly pleads that the Company failed to provide quarterly and annual reports. The complaint also plainly pleads that Goldenberg requested documents and did not receive them. These allegations state a claim for relief.

The Employment Agreement requires that the Company provide Goldenberg with quarterly reports:

> Within forty-five (45) days after the last day of each of its fiscal quarters (other than the final quarter of each fiscal year), Immunomedics will provide Dr. Goldenberg with a written report that includes a preliminary computation . . . of Net Revenue, of Product Royalties, and of royalties on Patented Products . . . and Disposition Payments . . . , and all amounts due to . . . Goldenberg pursuant to [the Transaction Payment Provision], [the Patent Royalties Provision], and [the Undeveloped Assets Provision] with respect to such fiscal quarter.

EA § 4.2(f) (the "Quarterly Reports Provision").

The Employment Agreement also requires that the Company provide Goldenberg with annual reports:

> Within two and one half . . . months after the last day of each of its fiscal years, Immunomedics will provide Dr. Goldenberg with a report that includes computation of Annual Net Revenue, of annual Product Royalties, of annual royalties on Patented Products, and Disposition Payments (if any) for the entire year and all amounts due with respect to that year . . . , as adjusted for the minimum payment provided to Dr. Goldenberg . . . .

*Id.* (the "Annual Reports Provision").

In addition to quarterly and annual reports, Goldenberg has the right to obtain documents and to audit the Company's reports once per year:

> Immunomedics will provide . . . documentation as Dr. Goldenberg deems reasonably necessary to verify the Company's calculations of the payments due to . . . Goldenberg pursuant to [the Transaction Payment Provision], [the Patent Royalties Provision], and [the Undeveloped Assets Provision]. At least once during each fiscal year, Dr. Goldenberg shall have the right to obtain access to . . . documents Dr. Goldenberg deems reasonably necessary to confirm Immunomedics' compliance with its obligations under this Agreement.

*Id.* (the "Documents Provision").

The Company does not dispute that it failed to comply with its obligations to provide the reports when they became due. Instead, the Company argues that it now has provided Goldenberg with quarterly reports. According to the Company, Goldenberg's claim should be dismissed because "Goldenberg has alleged no specific harm caused by the failure to timely send him reports." Dkt. 13 at 42–43.

The Company still has not provided Goldenberg with annual reports or with the documents he has requested, so Goldenberg's claim for breach remains live. Regardless, even as to the quarterly reports, the Company's argument incorrectly assumes that the only possible remedy for a breach of contract is an award of compensatory damages. But other remedies are possible. Under both Delaware law and New Jersey law, a party may prove a breach of contract and vindicate the associated right by recovering nominal damages. *See Ivize of Milwaukee, LLC v. Complex Litig. Support, LLC*, 2009 WL 1111179, at *12 (Del. Ch. Apr. 27, 2009); *Nappe v. Anschelwitz, Barr, Ansell & Bonello*, 477 A.2d 1224, 1228 (N.J. 1984). Other viable remedies may include declaratory relief or an order of specific performance.

The Company's argument also assumes that it fully cured its breaches of the Quarterly Reports Provision, yet Goldenberg has alleged that the quarterly reports do not contain the required information. The reports left the revenue line blank and failed to disclose transactions like the RPI Transaction. As to the Quarterly Reports Provision, Goldenberg's claim thus remains live.

Goldenberg points out that to the extent he must show some monetary loss to recover, he has incurred losses in the form of the fees and expenses that he incurred to

38

pursue the reports. In response, the Company argues that the American Rule generally prevents a party from recovering fees and expenses as damages. That is true, but the bad-faith exception to the American Rule permits the recovery of attorneys' fees as an element of damages if the underlying, pre-litigation conduct of the losing party was sufficiently egregious. *See Arbitrium (Cayman Is.) Handels AG v. Johnston*, 705 A.2d 225, 231 (Del. Ch. 1997), *aff'd*, 720 A.2d 542 (Del. 1998). Although the standard is difficult to meet, the court cannot rule out the possibility at the pleading stage. The complaint alleges that the Company knowingly breached the clear contractual requirements imposed by the Quarterly Reports Provision, the Annual Reports Provision, and the Documents Provision with the goal of hiding transactions from Goldenberg.

It is also possible that because the Employment Agreement was incorporated into the Settlement Stipulation, Goldenberg could recover fees and expenses as a remedy for a contumacious failure to comply with the Final Judgment. The Company's knowing failure to comply with the Quarterly Reports Provision, the Annual Reports Provision, and the Documents Provision would operate as the predicate breach of the Employment Agreement that would give rise to a violation of the Final Judgment. The Company's motion to dismiss this aspect of Count II is therefore denied.

### III. THE MOTION TO DISMISS COUNT III

In Count III, the complaint seeks declaratory judgments as to the Company's obligations (i) to make a second payment for the Everest Transaction under the Transaction Payment Provision and (ii) to make future payments under the Patent Royalties Provision.

The Company has moved to dismiss Count III under Rule 12(b)(1) on the theory that neither dispute is justiciable.

This court's power to grant declaratory judgment derives from the Delaware Declaratory Judgment Act. *See* 10 Del. C. § 6501. This court has the statutory power to "declare rights, status and other legal relations whether or not further relief is or could be claimed." *Id.* There are four prerequisites for declaratory judgment jurisdiction. *Monsanto Co. v. Aetna Cas. & Sur. Co.*, 565 A.2d 268, 274 (Del. Super. Ct. 1989). First, there "must be a controversy involving the rights or other legal relations of the party seeking declaratory relief." *Rollins Int'l, Inc. v. Int'l Hydronics Corp.*, 303 A.2d 660, 662 (Del. 1973). Second, there "must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim." *Id.* at 662–63. Third, "the controversy must be between parties whose interests are real and adverse." *Id.* at 663. Fourth, "the issue involved in the controversy must be ripe for judicial determination." *Id.*

"A dispute will be deemed ripe if litigation sooner or later appears to be unavoidable and where the material facts are static." *XL Specialty Ins. Co. v. WMI Liquid. Tr.*, 93 A.3d 1208, 1217 (Del. 2014). A controversy is not ripe for judicial review when the disagreement has "no significant current impact and may never ripen into legal actions . . . ." *Schick, Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1239 (Del. Ch. 1987). A determination of ripeness involves interest balancing, weighing "the interests of the court . . . in postponing review until the question arises in some more concrete and final form" against "the interests of those who seek relief from the challenged

40

action's immediate and practical impact upon them." *Id.* (quoting *Cont'l Air Lines, Inc. v. C.A.B.*, 522 F.2d 107, 124–125 (D.C. Cir. 1975)).

**A.      The Request For A Declaration As To The Everest Transaction**

Goldenberg seeks a declaratory judgment that the Company must make Transaction Payments to Goldenberg for the Everest Transaction. When Goldenberg filed the complaint, there was an upcoming payment due on March 15, 2021. Goldenberg reasonably believed that the Company would not make the payment. Instead, the Company made the payment and conceded that Goldenberg was entitled to Transaction Payments for the Everest Transaction.

Goldenberg's request for declaratory relief is therefore moot. The only remaining dispute is whether Immunomedics' recent payment to Goldenberg was for the correct amount, and that issue turns on the application of the Minimum Payments Provision. The relevant issues will be resolved under Count II. The request for declaratory relief as to the Everest Transaction is therefore dismissed.

**B.      The Request For A Declaration As To The Patent Royalties Provision**

Goldenberg also seeks a declaratory judgment that Immunomedics must comply with its future payment obligations under the Patent Royalties Provision, which states,

> Immunomedics will pay to Dr. Goldenberg for each full fiscal year of the Company, a sum equal to a percentage of the annual Product Royalties the Company receives each such fiscal year on each of the products for which Dr. Goldenberg is an Inventor, and all products using, related to or derived from products for which Dr. Goldenberg is an Inventor ("Patented Products"), which payments shall continue for each Patented Product for the remaining Life of the Patent covering each Patented Product (collectively "Patent Lifetime Royalty Payments"). The percentage of Product Royalties that Immunomedics will pay to Dr. Goldenberg on each Patented Product

41

will be determined based on the percentage of Product Royalties that Immunomedics must pay to external third parties (any party other than a wholly owned subsidiary of Immunomedics) on each Patented Product . . . .

EA § 4.2(a)(ii).

Goldenberg argues that there is a ripe dispute over the Patent Royalties Provision because Immunomedics has a history of failing to comply with its obligations, but that is not enough to make a dispute ripe. Because Immunomedics does not have any royalty agreements, the disagreement over the Patent Royalties Provision has no current significance. It is possible that the Company may never generate royalties. It is thus possible that the Patent Royalties Provision may never give rise to a dispute or result in litigation. Consequently, the dispute is not ripe for judicial review, and the claim is therefore dismissed.

## C. The Disputes Over Other Terms Of The Employment Agreement

During briefing, disputes arose over the meaning of various terms of the Employment Agreement. At oral argument, Goldenberg stated that he sought declaratory judgments regarding (i) whether the Contract Term ends on July 1, 2020, and the non-competition period ends on July 1, 2023, and (ii) whether Immunomedics must continue to provide quarterly and annual reports.

The court need not render separate declaratory judgments on these issues. This decision has held that under the plain language of the Employment Agreement, the Contract Term ended on July 1, 2020. It is not apparent that there is a justiciable dispute over the noncompetition period that warrants addressing at this time. The dispute over Goldenberg's rights to quarterly and annual reports will be resolved under Count II in

42

connection with the proper application of the Quarterly Reports Provision and the Annual Reports Provision.

## IV. CONCLUSION

The complaint pleads a claim to enforce the Final Judgment, so the defendant's motion to dismiss Count I is denied. The complaint pleads claims for breach of the Employment Agreement as to certain issues. The defendant's motion to dismiss Count II is therefore denied in part, but granted as to the RPI Stock Sale and the Janssen Transaction. The complaint does not establish a need for declaratory judgments, so the defendant's motion to dismiss Count III is granted.